**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**MICHAEL HOWARD,**

                                        **Plaintiff,**


                **-v-**                                        **17-CV-1295JLS(Sr)**

**UNITED STATES OF AMERICA,**

                                        **Defendant.**
_____


                        **REPORT, RECOMMENDATION AND ORDER**

        This case was referred to the undersigned by the Hon. John L. Sinatra, in

accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report upon

dispositive motions.  *See* Dkt. #8, 32.


        Pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*,

the plaintiff commenced this action on December 12, 2017, alleging that on August 10,

2016, a United States Postal Service ("USPS") employee, acting within the scope of his

employment and operating a USPS vehicle, collided with the plaintiff's vehicle, and that

as a result, the plaintiff sustained serious injuries.  Dkt. #1.


        Currently before the Court is the defendant's motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Dkt. #17.   For the

following reasons, it is recommended that the motion be granted in part and denied in

part.

                                        1

## FACTS[1]

The plaintiff brings this action claiming injuries from an automobile accident that occurred on August 10, 2016, in the City of Niagara Falls, New York, between his vehicle and a vehicle driven by a USPS employee.  Dkt. #19, ¶1; Dkt. #24, ¶1.

**Pre-Accident Activities**

At the time of the accident, the plaintiff was not employed.  Dkt. #19, ¶5; Dkt. #24, ¶5. He spent his days taking care of his girlfriend's three-year-old child.  Dkt. #19, ¶6; Dkt. #24, ¶6.  He spent his weekends with his two daughters.  Dkt. #19, ¶6; Dkt. #24, ¶6.  The plaintiff played basketball about once a month and rode dirt bikes, weather permitting, a couple times a week.  Dkt. #19, ¶6; Dkt. #24, ¶6.

**Post-Accident Treatment**

On the day of the accident, the plaintiff initially indicated that he did not need medical attention, but he changed his mind and sought attention for his left arm and side.  Dkt. #19, ¶7; Dkt. #24, ¶7.  He told ambulance personnel that he had back pain and that his arms were burning from the deployed airbags.  Dkt. #19, ¶7; Dkt. #24, ¶7. Ambulance personnel reported that the plaintiff's head and neck were atraumatic and symmetrical.  Dkt. #19, ¶7; Dkt. #24, ¶7.  His pain scale was 3/10.  Dkt. #19, ¶7; Dkt. #24, ¶7.  He was transported to the Niagara Falls Memorial Medical Center and had complaints related to his left arm, left neck, left chest, and back.  Dkt. #19, ¶8; Dkt. #24, ¶8.

---

[1] The following facts are taken from the statements of undisputed facts filed by both parties.

The defendant asserts that the plaintiff's back was not tender and that he had normal range of motion in all extremities. Dkt. #19, ¶9. The plaintiff denies that he had normal range of motion in all extremities and notes that the ER chart states "intact" rather than "normal." Dkt. #24, ¶9. The discharge diagnosis was chest wall contusion. Dkt. #19, ¶9; Dkt. #24, ¶9.

The day after the accident, on August 11, 2016, the plaintiff was seen at Cardamone Chiropractic.[2] Dkt. #19, ¶10; Dkt. #24, ¶10. The plaintiff reported neck, back and left shoulder pain, headache, dizziness, sleep difficulty, and fatigue. Dkt. #19, ¶10; Dkt. #24, ¶10. He also claimed that he was impaired in bending, lifting, sexual relations, standing, sleeping, cooking, car washing, house maintenance, and playing basketball. Dkt. #19, ¶11; Dkt. #24, ¶11. The plaintiff notes that Dr. Cardamone performed several orthopedic tests positive for cervical and/or lumbar local or referred symptomology. Dkt. #24, ¶114; Dkt. #29, ¶114. Cervical and lumbar range of motion measurements were taken with a digital inclinometer that indicated lumbar range of motion limitations between 54% to 67%, and cervical range of limitations between 45% and 68%. Dkt. #24, ¶115; Dkt. #29, ¶115. Dr. Cardamone's initial diagnoses included: cervical, thoracic, and lumbar disc displacements, muscle spasms and sprains/strains, cervicocranial syndrome, sacroiliac sprain/strain and subluxation, cervical and lumbar subluxations, muscle weakness, and sleep disturbance. Dkt. #24, ¶116; Dkt. #29, ¶116.

_____

[2] In an affidavit prepared after the motion for summary judgment was filed, Dr. Cardamone stated that the plaintiff had a temporary total disability from the outset of treatment through August 2017. *See* Dkt. #25-1, ¶10. Dr. Cardamone also stated that the plaintiff's disc injuries were more complicated than a simple sprain/strain, which prolonged and complicated treatment. *Id.*, ¶9.

The plaintiff notes that he returned to Dr. Cardamone on August 12, 2016, and reported severe pain with: drying his hair, tying his shoes, reaching, squatting, preparing food, doing the laundry, and taking out the trash. Dkt. #24, ¶112; Dkt. #29, ¶112. He also reported moderate pain with bathing, standing, walking, dressing, prolonged sitting, and driving. Dkt. #24, ¶112; Dkt. #29, ¶112.

On August 31, 2016, the plaintiff consulted with A. Marc Tetro, M.D. regarding left shoulder pain. Dkt. #19, ¶18; Dkt. #24, ¶18. The plaintiff told Dr. Tetro that after the accident, he experienced loss of consciousness and immediate pain in his left shoulder as well as pain in his chest, neck, mid- and low back, left elbow, and right leg. Dkt. #19, ¶18; Dkt. #24, ¶18. On examination, Dr. Tetro found mild limitation of motion in the cervical spine. Dkt. #19, ¶18; Dkt. #24, ¶18. Examination of the left shoulder revealed no significant deformity or muscle atrophy but maximum tenderness at the rotator cuff insertion and diffuse tenderness over the acromioclavicular joint and anterior glenohumeral joint. Dkt. #19, ¶18; Dkt. #24, ¶18. He had limited range of motion of the left shoulder. Dkt. #19, ¶18; Dkt. #24, ¶18. This included a limitation or reduction in range of motion ranging from 33 1/3% to 67%. Dkt. #24, ¶126; Dkt. #29, ¶126 (admitting but noting that the manner in which the ranges of motion were ascertained was not noted, and percentage of reduction was not noted in the contemporaneous medical records). The Neer's test and Hawkins test were positive for rotator cuff impingement. Dkt. #19, ¶18; Dkt. #24, ¶18. The O'Brien's test was positive for labral symptoms. Dkt. #24, ¶125; Dkt. #29, ¶125. The plaintiff also had a positive cross-body abduction test and AC joint tenderness. Dkt. #24, ¶125; Dkt. #29, ¶125. Dr. Tetro

diagnosed the plaintiff with a left shoulder rotator cuff sprain/possible tear, left shoulder possible glenoid labral tear, left shoulder AC joint sprain, and cervical origin of pain. Dkt. #24, ¶127; Dkt. #29, ¶127.  Dr. Tetro did not impose any limitations on the plaintiff's activities, and as to "Disability," Dr. Tetro noted that the plaintiff was not working prior to the accident.  Dkt. #19, ¶18; Dkt. #24, ¶18.  An x-ray of the plaintiff's left shoulder was normal.  Dkt. #19, ¶19; Dkt. #24, ¶19.

On September 1, 2016, the plaintiff saw Pratibha Bansal, M.D.  Dkt. #19, ¶13; Dkt. #24, ¶13.  The plaintiff complained of pain in his neck, left shoulder, lower back, and into the right leg in the back of the calf.  Dkt. #19, ¶13; Dkt. #24, ¶13.  On examination, the plaintiff had muscle spasms in his neck, shoulder, and upper back. Dkt. #19, ¶14; Dkt. #24, ¶14.  The plaintiff's active and passive flexion of the lumbosacral spine was 50, but he had full active and passive lumbosacral spine lateral flexion to the left and right.  Dkt. #19, ¶14; Dkt. #24, ¶14.  He had limited range of motion of the cervical spine.  Dkt. #19, ¶14; Dkt. #24, ¶14.

As to the plaintiff's shoulder, Dr. Bansal found no evidence of a rotator cuff tear but noted an abnormal signal along the length of the superior labral inferior to posterior (SLAP) tear, as well as mild to moderate osteoarthritis of the AC joint encroaching on the rotator cuff outlet.  Dkt. #19, ¶16; Dkt. #24, ¶16.

A September 9, 2016 MRI showed no evidence of a rotator cuff tear, but confirmed Dr. Bansal's finding of an abnormal signal along the length of the SLAP tear, and mild to moderate osteoarthrosis of the AC joint.  Dkt. #19, ¶20; Dkt. #24, ¶20.

On September 15, 2016, the plaintiff returned to Dr. Tetro and complained of significant pain and grinding sensations in the left shoulder and continued reduced abduction range of motion.  Dkt. #24, ¶130; Dkt. #29, ¶130.  Dr. Tetro's diagnosis included rotator cuff impingement syndrome/tendinitis, glenoid labral tear, and post-traumatic AC joint arthrosis along with cervical pain.  Dkt. #24, ¶130; Dkt. #29, ¶130. He was prescribed out-patient physical therapy.  Dkt. #24, ¶130; Dkt. #29, ¶130.

On September 20, 2016, the plaintiff began receiving physical therapy to his left shoulder at Advanced Care, PT.  Dkt. #19, ¶22; Dkt. #24, ¶22.  There, he complained of left shoulder pain, numbness, and tingling.  Dkt. #19, ¶22; Dkt. #24, ¶22.  On September 28, 2016, the plaintiff reported to his physical therapist that his shoulder felt better after his initial treatment, but the plaintiff did not return to physical therapy until January 2017.  Dkt. #19, ¶23; Dkt. #24, ¶23.

On September 28, 2016, the plaintiff underwent an MRI of his cervical and lumbar spines.  Dkt. #19, ¶24; Dkt. #24, ¶24.  A left-sided disc herniation was identified which indented the thecal sac.  Dkt. #19, ¶24; Dkt. #24, ¶24.  The lumbar MRI showed right paracentral disc herniations.  Dkt. #19, ¶24; Dkt. #24, ¶24.

Dr. Bansal saw the plaintiff again on October 11, 2016, and his left shoulder was evaluated. Dkt. #19, ¶17; Dkt. #24, ¶17. He was diagnosed with traumatic arthropathy in his left shoulder. Dkt. #19, ¶17; Dkt. #24, ¶17. Dr. Bansal did not impose any limitations on the plaintiff's activities. Dkt. #19, ¶17; Dkt. #24, ¶17.

Between October 11, 2016, and December 31, 2016, the plaintiff was incarcerated in the Niagara County Jail and did not receive medical treatment during this period. Dkt. #19, ¶25; Dkt. #24, ¶25.

On December 31, 2016, Dr. Cardamone reevaluated the plaintiff's spinal range of motion measurements and found limitations in his lumbar range of motion ranging from 44% to 55%, and cervical range of motion limitations ranging from 31% to 62%. Dkt. #24, ¶120; Dkt. #29, ¶120 (admitting but noting that the percentages were not noted in contemporaneous records). He continued to receive chiropractic treatments until February 20, 2018. Dkt. #19, ¶12; Dkt. #24, ¶12.

On January 4, 2017, the plaintiff reported to Dr. Tetro that he had ongoing shoulder symptoms, and Dr. Tetro recommended continued physical therapy. Dkt. #19, ¶26; Dkt. #24, ¶26.

On February 15, 2017, the plaintiff consulted with P. Jeffrey Lewis, M.D. Dkt. #19, ¶54; Dkt. #24, ¶54. The plaintiff complained of pain in his back, neck, and shoulder, and difficulty picking items up. Dkt. #19, ¶54; Dkt. #24, ¶54. Dr. Lewis found

restricted ranges of motion of the cervical and lumbar spine but did not note the degree of limitation. Dkt. #19, ¶54; Dkt. #24, ¶54. The plaintiff notes that Dr. Lewis described "relatively severe" restrictions on cervical flexion and extension, Dkt. #24, ¶54, but Dr. Lewis did not impose any restrictions on the plaintiff, *id.*; Dkt. #19, ¶54.

On March 31, 2017, the plaintiff reported to Dr. Tetro that he had done physical therapy for ten weeks, twice a week, and that it improved his range of motion but he continued to have pain. Dkt. #19, ¶27; Dkt. #24, ¶27. The plaintiff received a corticosteroid injection which improved his pain temporarily. Dkt. #19, ¶27; Dkt. #24, ¶¶27, 131; Dkt. #29, ¶131. The plaintiff temporarily stopped attending physical therapy on April 24, 2017. Dkt. #19, ¶29; Dkt. #24, ¶29.

On April 25, 2017, the plaintiff underwent an independent medical examination by Stephen Brenner, M.D. Dkt. #19, ¶55; Dkt. #24, ¶55. The plaintiff was able to move his head, neck, and body, could sit on the examination table without assistance, and could turn from side to side easily. Dkt. #19, ¶55; Dkt. #24, ¶55. The plaintiff reported he could not do activities such as gardening, sports, driving, washing dishes, washing clothes, vacuuming, sweeping, tying his shoes, cooking, personal hygiene, child care, and shopping/errands. Dkt. #19, ¶56; Dkt. #24, ¶56.

Examination of his cervical spine showed all ranges of motion to be within 10 degrees of normal, except as to extension—his extension was measured at 40 degrees whereas normal is 60 degrees. Dkt. #19, ¶55; Dkt. #24, ¶55. His range of motion of the

lumbar spine was within 10 degrees of normal, and his straight leg raise was normal. Dkt. #19, ¶55; Dkt. #24, ¶55. The plaintiff admits these facts but notes that the ranges represent a 20% limitation in cervical flexion, a 22% limitation in cervical right and left lateral flexion, a 12.5% limitation in cervical right and left rotation, a 16.7% limitation in lumbar flexion, and a 40% limitation in lumbar extension. Dkt. #24, ¶55. His cervical extension was limited by 33.3%, and his lumbar right and left lateral bending was 20% restricted. Dkt. #24, ¶55.

Dr. Brenner concluded that the plaintiff's cervical, thoracic, and lumbar spine strain/sprains were resolving. Dkt. #19, ¶57; Dkt. #24, ¶57. He found evidence of a mild orthopedic disability and that the plaintiff was capable of performing activities of daily living. Dkt. #19, ¶57; Dkt. #24, ¶57. He also noted that the plaintiff was capable of working with a 40-pound lifting restriction. Dkt. #19, ¶57; Dkt. #24, ¶57.

On April 25, 2017, the plaintiff underwent an independent chiropractic/ acupuncture examination by Craig Horner, D.C., M.S., L.Ac. Dkt. #19, ¶58; Dkt. #24, ¶58. The cervical and lumbar spine had no spasms. Dkt. #19, ¶58. The range of motion in his cervical and lumbar spine was significantly less than normal, and Dr. Horner noted that the plaintiff made suboptimal effort during examination. Dkt. #19, ¶58. The plaintiff denies that there was suboptimal effort. Dkt. #24, ¶58. Dr. Horner opined that the plaintiff's strain/sprains were resolved, that his complaints were not supported by objective findings, and that there was no causally related disability from a chiropractic standpoint such that the plaintiff was capable of working and carrying out

activities of daily living without restriction.  Dkt. #19, ¶58.  The plaintiff notes that Dr. Horner found a "cause and effect relationship between the above-diagnosed injuries and the reported accident."   Dkt. #24, ¶58.

On May 19, 2017, Dr. Tetro found the plaintiff to have limited shoulder range of motion including a 12 to 25% reduction.  Dkt. #24, ¶131; Dkt. #29, ¶131 (admitting but noting that percentage was not noted in the contemporaneous records).

The plaintiff underwent an independent medical examination by orthopedic surgeon Gregory Chiarmonte, M.D., on June 28, 2017.  Dkt. #19, ¶59; Dkt. #24, ¶59. The plaintiff could walk for 2.5 blocks, stand for five minutes, and sit for one hour before needing to change positions.  Dkt. #19, ¶59; Dkt. #24, ¶59.  He could not perform the following activities: gardening, sports, washing clothes, and sleeping.  Dkt. #19, ¶59; Dkt. #24, ¶59.  He complained that his back and left shoulder pain had worsened.  Dkt. #19, ¶59; Dkt. #24, ¶59.  The plaintiff's range of motion was measured with a goniometer.  Dkt. #19, ¶60; Dkt. #24, ¶60.  As to the cervical spine, there was mild muscle spasm on palpation and mild tenderness on palpation.  Dkt. #19, ¶60; Dkt. #24, ¶60.  His ranges of motion of the cervical spine were normal.  Dkt. #19, ¶60; Dkt. #24, ¶60.  As to the lumbar spine, there was mild muscle spasm upon palpation and complaint of mild tenderness.  Dkt. #19, ¶61; Dkt. #24, ¶61.  His ranges of motion of the lumbar spine were normal in terms of extension and straight leg range, but less than normal in terms of flexion, right lateral bending, and left lateral bending.  Dkt. #19, ¶61; Dkt. #24, ¶61.  The plaintiff notes that he was utilizing a back brace which was removed

for the examination, and Dr. Chiarmonte also recorded left shoulder range of motion restrictions with a positive impingement test.  Dkt. #24, ¶61.

Dr. Chiarmonte noted that the cervical and lumbar and shoulder strain/sprains were resolving.  Dkt. #19, ¶63; Dkt. #24, ¶63.  He found mild orthopedic disability and opined that the plaintiff was capable of working with a 40-pound lifting restriction and performing activities of daily living.  Dkt. #19, ¶63; Dkt. #24, ¶63.

On July 27, 2017, Dr. Tetro performed the plaintiff's left shoulder surgery including an arthroscopic left subacromial decompression, extensive debridement of the glenoid labrum, and distal clavicle excision.  Dkt. #19, ¶28; Dkt. #24, ¶28.  The plaintiff states that post-operation, he was instructed to avoid any strenuous activity such as lifting, pulling, or repetitive activities for 4-5 weeks, and not to drive a car until the narcotics discontinued and he felt comfortable to drive, estimated to be approximately 1-2 weeks.  Dkt. #24, ¶38.

On August 1, 2017, the plaintiff resumed physical therapy.  Dkt. #19, ¶29; Dkt. #24, ¶29.  Throughout the month of August, the plaintiff reported to his physical therapist that his left shoulder had improved after each treatment.  Dkt. #19, ¶31; Dkt. #24, ¶31.  By August 22, 2017, the plaintiff reported that his shoulder was doing "really good."  Dkt. #19, ¶32; Dkt. #24, ¶32.

The plaintiff last visited Dr. Tetro on September 18, 2017. Dkt. #19, ¶36; Dkt. #24, ¶36. The plaintiff reported he was doing well following surgical intervention and that his pain continued to improve. Dkt. #19, ¶36; Dkt. #24, ¶36. He was advised to finish formal therapy and transition to a home program. Dkt. #19, ¶36; Dkt. #24, ¶36. At this time, the plaintiff's external rotation side range of motion was limited by 33 1/3%. Dkt. #24, ¶133; Dkt. #29, ¶133.

On October 4, 2017, the plaintiff told his physical therapist that he was "doing good and [was] happy with the progress." Dkt. #19, ¶37; Dkt. #24, ¶37. The physical therapist noted improvement with pain level and range of motion. Dkt. #19, ¶37; Dkt. #24, ¶37. The last record of a visit was on November 30, 2017. Dkt. #19, ¶37; Dkt. #24, ¶37.

On October 11, 2017, the plaintiff had a consult with the Medical Care of Western New York ("MCWNY"). Dkt. #19, ¶46; Dkt. #24, ¶46. The plaintiff reported weakness in lifting, bending, walking, vacuuming, cleaning, and preparing meals, increased pain with transportation, and restricted movement in caring for children and shopping. Dkt. #19, ¶65; Dkt. #24, ¶65. He reported performing activities of daily living "under duress." Dkt. #19, ¶46; Dkt. #24, ¶46. He reported fatigue when taking out the trash, that his girlfriend drives, and that his mother prepares food and assists with personal hygiene. Dkt. #19, ¶65; Dkt. #24, ¶65. The plaintiff notes that he also reported weakness in yard work, disrupted sleep up to 5 times per night due to pain, changing position every couple of minutes to alleviate discomfort, anxiety and depression related to his injuries,

12

aching and cramping in his neck, back, and left shoulder, and radiating numbness into the extremities.  Dkt. #24, ¶65.  He was able to actively and passively flex and abduct his shoulder to 180 degrees with some end-range tenderness.  Dkt. #19, ¶46; Dkt. #24, ¶46.  His internal and external rotation was mildly limited.  Dkt. #19, ¶46; Dkt. #24, ¶46.

The plaintiff was noted to have limited range of motion in his spine, but the manner of these measurements was not noted.  Dkt. #19, ¶66; Dkt. #24, ¶66.  The plaintiff notes that the range of motion in his lumbar spine was restricted by a minimum of 33% and up to 83%.  Dkt. #24, ¶66. The plaintiff also notes that he was found to be temporarily totally impaired as a direct result of the accident forming the basis of his inability to return to gainful employment.  Dkt. #24, ¶66.

In a letter dated October 17, 2017, Dr. Cardamone noted an increase in the plaintiff's cervical and lumbar range of motion and decreased muscle spasms.  Dkt. #19, ¶67; Dkt. #24, ¶67.  The plaintiff admits this, but notes that the improved ranges of motion still ranged from 20% to 40% limitation in the cervical spine and 28% to 43% in the lumbar spine.  Dkt. #24, ¶67.  Dr. Cardamone continued to treat the plaintiff until February 2, 2018, but did not reevaluate the plaintiff's cervical and lumbar range of motion after October 2017.  Dkt. #19, ¶68; Dkt. #24, ¶68.

On October 27, 2017, in a questionnaire for social security disability benefits,[3] the plaintiff reported that he could no longer play sports, run, bend, and squat. Dkt. #19, ¶77. As to personal care, he stated that he could lay down to put pants on and that his back goes out sometimes. *Id.* He admitted that as of October 2017, he could prepare daily meals, wash dishes, and iron. *Id.* He went out every day, rode in a car, and could go out alone. *Id.* His hobbies were watching television, playing basketball, and running, and he said he did these things every day, though he could not play basketball because his back acted up and his legs would become numb. *Id.* He reported spending time with his children. *Id.* He did not indicate problems lifting, standing, walking, sitting, climbing stairs, or using his hands, but kneeling and squatting hurt his back. *Id.* He could walk two blocks before needing to rest. *Id.*

On November 1, 2017, the plaintiff was evaluated by Gregory Chiarmonte, M.D. Dkt. #19, ¶42; Dkt. #24, ¶42. The plaintiff reported he could walk for one block, stand for five minutes before needing to sit, and sit for 20 minutes before having to change positions. Dkt. #19, ¶42; Dkt. #24, ¶42. He claimed he could not do the following activities because of his injury: gardening, sports, driving, washing clothes, vacuuming, sweeping, tying his shoes, and shopping/running errands. Dkt. #19, ¶43; Dkt. #24, ¶43. Dr. Chiarmonte found that the lumbar spine sprain/strain was resolved. Dkt. #19, ¶72; Dkt. #24, ¶72. Dr. Chiarmonte measured the plaintiff's range of motion in his shoulder, and opined that the injury was resolving and that the plaintiff was capable of performing

---

[3] The plaintiff disputes that these facts are material facts for the current case because the standard to obtain social security disability benefits is different from the standard used in No Fault cases and thus not relevant to the issue of "serious injury." Dkt. #24, ¶76.

activities of daily living, and he could work without repetitive use of his left arm or pulling, pushing, or lifting over 30 pounds.  Dkt. #19, ¶¶44, 45; Dkt. #24, ¶¶44, 45.  He concluded that the plaintiff had a mild causally-related disability.  Dkt. #19, ¶45; Dkt. #24, ¶45.

As part of the plaintiff's application for social security disability benefits, on November 18, 2017, the plaintiff was evaluated by Hongbaio Liu, M.D.[4]  Dkt. #19, ¶82. The plaintiff could squat to 30% because of low back pain, but he needed no help changing for the exam or getting on or off the table.  *Id.*  He could rise from the chair without difficulty.  *Id.*  His cervical spine showed full flexion.  *Id.*  The plaintiff could cook five times a week, clean and do laundry once a week, perform childcare and take showers three times a week, and bathe twice a week.  *Id.*, ¶83.  Dr. Liu concluded that the plaintiff had a mild to moderate limitation for prolonged walking, bending, kneeling, and overhead reaching, and a mild limitation for fine manipulation with his left hand.  *Id.*, ¶84.

On November 20, 2017, the plaintiff was seen at MCWNY.  Dkt. #19, ¶73; Dkt. #24, ¶73.   The plaintiff's internal and external shoulder rotation range of motion was mildly limited, but the degree of limitation was not noted.  Dkt. #19, ¶73; Dkt. #24, ¶73. The plaintiff had limited ranges of motion of his cervical and lumbar spine, but the manner in which the range of motion testing was performed was not identified.  Dkt. #19, ¶73; Dkt. #24, ¶73.  The plaintiff was found to be temporarily totally impaired as a

---

[4] The plaintiff notes that Dr. Lin is not a treating physician and argues that his unsworn report is not admissible.  Dkt. #24, ¶82.

result of the accident and unable to return to gainful employment, though he was not working at the time. Dkt. #19, ¶73; Dkt. #24, ¶73. The plaintiff reported issues with his household duties including weakness in vacuuming and doing yard work, fatigue in transportation and taking out trash, and restricted movement in shopping, caring for children, cleaning, and preparing meals. Dkt. #19, ¶73; Dkt. #24, ¶73.

On January 29, 2018, the plaintiff returned to MCWNY and reported performing activities of daily living under duress. Dkt. #19, ¶74; Dkt. #24, ¶74. He reported restricted movement in vacuuming, cleaning, preparing meals, transportation, and taking out trash, and increased pain in caring for children, yard work, and shopping. Dkt. #19, ¶74; Dkt. #24, ¶74. He was cleared to return to light duty with no lifting of more than 20 pounds. Dkt. #19, ¶75; Dkt. #24, ¶75.

The plaintiff again returned to MCWNY on January 29, 2018, reporting that he performed activities of daily living under duress. Dkt. #19, ¶47; Dkt. #24, ¶47. His range of motion in the shoulder was unchanged from prior visits. Dkt. #19, ¶47; Dkt. #24, ¶47. The plaintiff notes that Dr. Calabrese again recorded cervical range of motions limitations and found the plaintiff to be temporarily partially impaired of a moderate degree as a result of the collision. Dkt. #24, ¶47.

On February 15, 2018, the plaintiff returned to MCWNY. The defendant asserts that the plaintiff's complaints were limited to an unrelated injury, Dkt. #19, ¶89, but the plaintiff notes he had been advised to follow up with his no-fault case, Dkt. #24, ¶89.

16

The defendant notes that the plaintiff made no complaints about his back, neck, or shoulder, Dkt. #19, ¶89, and the plaintiff notes that he was advised to continue physical therapy, Dkt. #24, ¶89.

He returned to MCWNY on September 18, 2018, and reported working a lot.[5] Dkt. #19, ¶90; Dkt. #24, ¶90. He also reported intermittent low back pain. Dkt. #19, ¶90; Dkt. #24, ¶90. On November 5, 2018, he returned and said he no longer followed up with his no fault provider. Dkt. #19, ¶91; Dkt. #24, ¶91. He made no complaints about his neck, back, or shoulder. Dkt. #19, ¶91; Dkt. #24, ¶91.

On December 12, 2018, the plaintiff underwent an independent medical examination by John Leddy, M.D. Dkt. #19, ¶49; Dkt. #24, ¶49. The plaintiff told Dr. Leddy that his left shoulder hurt immediately after the accident, that he had trouble picking up his children, and that he felt a painful clicking sensation whenever he raised his left arm. Dkt. #19, ¶49; Dkt. #24, ¶49. The plaintiff also reported that the shoulder surgery helped him a lot, that he had postoperative physical therapy, and that he got his range of motion back. Dkt. #19, ¶49; Dkt. #24, ¶49. The plaintiff was able to return to work with a 50-pound restriction. Dkt. #19, ¶49; Dkt. #24, ¶49. As of the date of Dr. Leddy's examination, the plaintiff had been working as a forklift driver for seven months. Dkt. #19, ¶49; Dkt. #24, ¶49.

---

[5] In May 2018, the plaintiff began working at Sumitomo Rubber. Dkt. #19, ¶88; Dkt. #24, ¶88.

Dr. Leddy noted that the plaintiff had no rotator cuff muscle atrophy and full range of motion. Dkt. #19, ¶50; Dkt. #24, ¶50. The plaintiff notes that Dr. Leddy does not state the method or instrument by which he measured the ranges of motion. Dkt. #24, ¶50. Dr. Leddy concluded that there had been resolution of the sprains and strains. Dkt. #19, ¶51; Dkt. #24, ¶51.

As to his back, the plaintiff told Dr. Leddy that his neck was sometimes bothersome during bad weather or if he slept on it wrong. Dkt. #19, ¶93; Dkt. #24, ¶93. The plaintiff stated that his low back had "gone out" on him three times in the past year and that if he sits too long his legs go numb. Dkt. #19, ¶93; Dkt. #24, ¶93. Examination of his cervical spine revealed no cervical or trapezius muscle tenderness, spasm, or muscle atrophy. Dkt. #19, ¶93; Dkt. #24, ¶93. He was slightly tender at C5-6. Dkt. #19, ¶93; Dkt. #24, ¶93. He had full cervical flexion extension and normal right and left rotation. Dkt. #19, ¶93; Dkt. #24, ¶93. His lumbar spine was not tender to palpation and he had full range of motion with flexion and extension. Dkt. #19, ¶93; Dkt. #24, ¶93. He had some tightness at full extension but no pain. He had no palpable lumbar spasm. Dkt. #19, ¶93; Dkt. #24, ¶93. Dr. Leddy concluded that Howard sustained cervical, thoracic, and lumbar strains and sprains in the accident. Dkt. #19, ¶93; Dkt. #24, ¶93. Dr. Leddy found resolution of the sprains and strains because he had no muscle atrophy, muscle spasm, or evidence of cervical or lumbar radiculopathy. Dkt. #19, ¶94; Dkt. #24, ¶94.

**Post-Accident Activities**

After the accident, the plaintiff continued to care for his girlfriend's three-year-old child, and his daughters continued to visit him on the weekends.  Dkt. #19, ¶97; Dkt. #24, ¶97.  He could use one hand to lift groceries.  Dkt. #19, ¶97; Dkt. #24, ¶97.  He had trouble sweeping and mopping.  Dkt. #19, ¶97; Dkt. #24, ¶97.  He would tire from walking upstairs, so he would walk up the stairs more slowly.  Dkt. #19, ¶97; Dkt. #24, ¶97.  He had trouble going into cabinets.  Dkt. #19, ¶97; Dkt. #24, ¶97.

As of February 2017, the plaintiff could not play basketball games.  Dkt. #19, ¶99; Dkt. #24, ¶99.  He had to take break during activities such as cooking or playing with the children, though he was able to perform these activities.  Dkt. #19, ¶99; Dkt. #24, ¶99.

In January 2018, the plaintiff got back into exercising including push-ups, lifting weights, and jumping rope.  Dkt. #19, ¶86; Dkt. #24, ¶86.  In May 2018, the plaintiff began working at Sumitomo Rubber.  His duties include inventory work and forklift driving.  Dkt. #19, ¶88; Dkt. #24, ¶88.  He also rolls tires from a machine to a hoist.  Dkt. #19, ¶102; Dkt. #24, ¶102.  When not driving, his job requires extended periods of time of standing, but he has not been given any work accommodations and passed a physical to work.  Dkt. #19, ¶88; Dkt. #24, ¶88.  He works 12 hour shifts three days a week.  Dkt. #19, ¶102; Dkt. #24, ¶102.

As of November 2018, the plaintiff sometimes cooked or did some of the housekeeping.  Dkt. #19, ¶101; Dkt. #24, ¶101.  He was able to work out, do eight pushups, use a 20-pound dumbbell with his left arm, and jump rope.  Dkt. #19, ¶101; Dkt. #24, ¶101.  Since gaining employment, he has not missed any work because of his back, shoulder, or neck, and if he has an ache or pain he keeps going.  Dkt. #19, ¶101; Dkt. #24, ¶101.

**Current Proceedings**

The plaintiff commenced this action on December 12, 2017, Dkt. #1, and the defendant filed its answer to the complaint on March 14, 2018, Dkt. #7.

The undersigned issued a case management order on April 30, 2018, directing discovery to be completed by June 30, 2019, and dispositive motions to be filed by July 31, 2019.  Dkt. #10.

In accordance with the case management order, the defendant moved for summary judgment on July 31, 2019.  Dkt. #17.  The plaintiff filed his opposition to the defendant's motion on September 20, 2019, Dkt. #24-26, and the defendant filed its reply on November 5, 2019, Dkt. #28, 29.

DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual dispute is material "only if it has some effect on the outcome of the suit." *Eagley v. State Farm Ins. Co.*, No. 13-CV-6653, 2015 WL 5714402, at *5 (W.D.N.Y. Sept. 29, 2015) (citation and quotation omitted). Moreover, a genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

**Federal Tort Claims Act**

The plaintiff brings his complaint pursuant to the FTCA, which provides that a plaintiff may recover "for . . . personal injury . . . caused by the negligent . . . act or omission of any employee of the Government while acting under the scope of his office or employment, under circumstances which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). An "employee of the Government" encompasses "officers or employees of any federal agency." 28 U.S.C. § 2671.

21

Section 1346(b) of Title 28 of the United States Code provides that, in FTCA cases, the liability of the United States for negligent acts is "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  The parties agree that the applicable substantive law in this case is New York law because the accident occurred in New York State.


**New York "No Fault" Law**

New York State's No Fault Insurance Law ("No Fault statute") provides that in a personal injury or negligence action between "covered persons," "there shall be no right of recovery for non-economic loss, [e.g., pain and suffering,] except in the case of a serious injury, or for basic economic loss."  N.Y. Ins. Law §§ 5104(a), 5102(c).  The No Fault statute defines "serious injury" as:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).  The No Fault statute defines "basic economic loss" as "medical costs, 'lost wages,' and 'reasonable and necessary expenses' totaling to $50,000 or less."  *Comba v. United States*, 535 F. Supp. 3d 97, 107 (E.D.N.Y. 2021) (quoting N.Y. Ins. Law. § 5102(a)).  Therefore, to recover economic damages, the plaintiff must show that he "has suffered more than $50,000 in the form of medical costs and other expenses."  *Id.* (alterations accepted and internal quotation marks and citation omitted).

Without contesting liability, the defendant moves for summary judgment on the grounds that the plaintiff's injuries do not constitute a serious injury within the meaning of the No Fault statue.  On a motion for summary judgment, a defendant must establish a *prima facie* case that the plaintiff did not sustain a "serious injury" within the meaning of N.Y. Ins. Law § 5102(d).  *Molina v. United States*, 301 F.Supp.2d 317, 320 (S.D.N.Y. 2004).  "The defendant may satisfy this initial burden with unsworn reports by the plaintiff's physicians or with sworn affidavits or affirmations by the defendant's own retained physicians."  *Thomas v. O'Brien,* 08–CV–3250 (RLM), 2010 WL 785999, at *7 (E.D.N.Y. Feb. 26, 2010).

If the defendant has met this burden, "the burden then shifts to the plaintiff to defeat the motion by submitting sworn affidavits or affirmations by [his] physicians that support [his] claim of serious injury."  *Mueller v. Seatainer Transp., Ltd*., 816 F. Supp. 2d 206, 210–11 (W.D.N.Y. 2011); *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) ("For plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians." (internal quotation marks and citation omitted)).  To properly demonstrate a "serious injury," a plaintiff must provide "objective proof of [his] injury," as "subjective complaints alone are not sufficient."  *Toure v. Avis Rent A Car Systems, Inc*., 98 N.Y.2d 345, 350 (2002).  Additionally, a plaintiff "must show that the injury was proximately caused by the accident at issue."  *Evans v. United States*, 978 F. Supp. 2d 148, 164 (E.D.N.Y. 2013) (internal quotation marks and citation omitted).

**Economic Damages and Significant Disfigurement**

The defendant has moved for summary judgment insofar as the plaintiff seeks to recover: 1) economic damages, Dkt. #18, pp.6-7; and 2) non-economic damages based on a significant disfigurement theory, *id.*, pp.16-18.  The plaintiff does not dispute that his basic economic loss does not exceed $50,000, and he withdraws any allegations of a significant disfigurement.  Dkt. #26, p.2.  Therefore, to the extent the plaintiff abandons these theories, this Court recommends granting summary judgment.  *See Jenkins v. Portfolio Recovery Associates, LLC*, No. 14-cv-3532, 2017 WL 1323798, at *8 (E.D.N.Y. Feb. 13, 2017) (granting summary judgment where plaintiff acknowledges the claims lack merit).

**Significant or Permanent Consequential Limitation**

The defendant also seeks summary judgment on the plaintiff's theory that because of the accident, he suffered a serious injury in the form of both a: 1) permanent consequential limitation of use of a body organ or member; and 2) significant limitation of use of a body function or system.  Dkt. #18, pp.8-14.  These categories "overlap and are often considered together."  *Comba*, 535 F. Supp. 3d at 108.

"Whether a limitation of use or function is 'significant' or 'consequential' (i.e., important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part."  *Dufel v. Green*, 84 N.Y.2d 795, 798 (1995) (internal citations omitted).  A significant limitation of a body function or system must be "significant, meaning more than minor, in both degree and duration," but does not require

24

permanence. *Buccilli v. United States*, No. 14-cv-166, 2016 WL 4940260, at *7

(W.D.N.Y. Feb. 3, 2016) (internal citations and quotations omitted), *report and

recommendation adopted*, No. 14-CV-166A, 2016 WL 4940261 (W.D.N.Y. Mar. 9,

2016); *Licari v. Elliott*, 57 N.Y.2d 230, 236 (1982) ("We believe that a minor, mild or

slight limitation of use should be classified as insignificant within the meaning of the

statute."); *Miller v. Miller*, 100 A.D.2d 577, 578 (N.Y. App. Div. 1984) (noting that

significant limitation of use category does not require permanence).


To meet its initial burden, the defendant reiterated a timeline of the plaintiff's

alleged spinal and shoulder injuries from April 25, 2017, through November 2018,

highlighting the conclusions of various physicians. *See* Dkt. #18, pp.10-12 (noting, *inter

alia*, that several physicians concluded that the plaintiff's injuries were resolving, that he

could perform activities of daily living and work with some weight limitations, and that

the plaintiff had a "mild" disability). The defendant also points to the report of its expert,

Dr. Leddy, who examined the plaintiff on December 12, 2018. *Id.*, pp.12-13. At the

exam, the plaintiff reported that after surgery and physical therapy, his range of motion

returned to normal in his left shoulder. *Id.*, p.12. The plaintiff reported some issues with

his neck and back, but Dr. Leddy found full cervical flexion, extension, and normal right

and left rotations. Dkt. #19, ¶93. Upon examining the plaintiff's lumbar spine, he found

full range of motion with flexion and extension. *Id.* Dr. Leddy opined that the plaintiff

does not have a permanent consequential or significant limitation of the left shoulder,

cervical spine, or lumbar spine as a result of the accident. Dkt. #20-1, p.268.

The plaintiff argues that the Court should not give any weight to Dr. Leddy's report. Dkt. #26, pp.3-6. However, most of the plaintiff's issues with the report relate to causation *id.*, pp.3-5, an additional requirement but distinct from this threshold issue of serious injury.[6] The plaintiff does note that Dr. Leddy's report failed to reference the "significantly limited shoulder and cervical/lumbar range of motions measurements repeatedly made by Drs. Tetro and Cardamone in their treatment notes while actively treating Mr. Howard in the two year period before Dr. Leddy did his exam." *Id.*, p.5. Nonetheless, even if this presented a sufficient reason to disregard Dr. Leddy's report in its entirety, the defendant referenced other medical opinions that satisfy the defendant's initial burden.

That evidence includes the lack of significant physician-imposed restrictions and Dr. Brenner's and Dr. Chiaramonte's conclusion that the plaintiff's disability was "mild." *See Pugh v. DeSantis*, 37 A.D.3d 1026, 1029 (N.Y. App. Div. 2007) (noting that to substantiate a claim under permanent consequential limitation or significant limitation, the medical evidence must demonstrate that the limitation be more than mild, minor, or slight, and either: 1) objective, quantitative evidence of diminished range of motion; or 2) qualitative assessment comparing present limitations to normal function, purpose, and use of the affected organ, member, function, or system). While in November 2017, the plaintiff was deemed temporarily totally disabled after he did not show a normal range of motion in his cervical and lumbar spine, the report did not specify how these measurements were conducted. Dkt. #18, p.11; *see Mikl v. Shufelt*, 285 A.D.2d 949, 950 (N.Y. App. Div. 2001) (noting that findings of limited range of motions may

---

[6] In any event, the defendant withdrew its arguments regarding causation in its reply papers. Dkt. #28, p.8.

nonetheless fail to establish a serious injury where medical experts provide no details as to the findings or how they were ascertained).  As to the plaintiff's shoulder, his range of motion returned to normal after surgery.  *See Shackett v. Nappi*, 75 A.D.3d 709, 710 (N.Y. App. Div. 2010) (noting that "most recent medical records indicate that plaintiff had recovered full range of motion in his neck, thereby precluding a finding of permanent consequential limitation of use and/or significant limitation of use").  Additionally, the defendant notes that at the time of briefing, none of the treating physicians had deemed the plaintiff's injuries permanent.  Dkt. #18, p.13.  Therefore, this Court concludes that the defendant made a *prima facie* showing that the plaintiff did not sustain a significant or permanent consequential limitation.

To establish a material issue of fact, the plaintiff submitted Dr. Tetro's affirmation and Dr. Cardamone's affidavit with their respective treatment records.  *See* Dkt. #25.  The plaintiff notes that on August 31, 2016, Dr. Tetro initially recorded a 33% to 67% limitation in the plaintiff's left shoulder range of motion.  Dkt. #26, p.10.  An MRI, conducted on September 9, 2016, revealed a SLAP tear and mild to moderate osteoarthrosis of the AC joint.  *Id.*  On September 15, 2016, the plaintiff's external rotation range of motion was limited by 25% to 41%, and in March 2017, despite ten weeks of physical therapy, his range of motion remained limited by 15% to 25%.  *Id.*  Dr. Tetro last saw the plaintiff on September 18, 2017, at which time his external rotation side range of motion was still limited by 33 1/3%.  Dkt. #24, ¶133; Dkt. # 29, ¶133.  Dr. Tetro opined that the plaintiff sustained significant injuries to his left shoulder and suffered significant function limitations in the use of the left shoulder and arm as

documented by the serial range of motion notions.  Dkt. #26, p.10.  Dr. Tetro described these limitations as significant and longstanding.  *Id.*

The defendant argues that these range of motion measurements should not be considered because Dr. Tetro failed to specify the manner in which he ascertained the plaintiff's limitations.  Dkt. #28, p.6; *see also Sweeney v. United States*, No. 14-CV-402-A, 2018 WL 1428253, at *1 (W.D.N.Y. Mar. 22, 2018) ("Such findings of limited range of motions may nonetheless fail to establish a serious injury where medical experts provide no details as to the findings or how they were ascertained.").  This relates to the general rule that "a finding of reduced range of motion [can be] insufficient to establish serious injury because such a determination is based on subjective complaints of pain." *O'Brien v. Bainbridge*, 89 A.D.3d 1511, 1512 (N.Y. App. Div. 2011).  However, "[a] medical analysis based in part on subjective range-of-motion tests may be sufficient if it is supported by other medical evidence, such as MRIs showing disc herniations and bulges." *Mercado v. Lee*, No. 04 CIV. 7166, 2008 WL 4963985, at *4 (S.D.N.Y. Nov. 21, 2008) (internal quotation marks and citation omitted).  Here, the plaintiff has set forth evidence that an MRI revealed a SLAP tear and mild to moderate osteoarthrosis of the AC joint, and he ultimately underwent surgery.  This Court concludes that this establishes an issue of fact as to whether the plaintiff's shoulder injury posed a significant limitation.

The plaintiff also points to Dr. Cardamone's cervical and lumbar range of motion measurements, and an MRI from September 26, 2016, that revealed herniations indenting the thecal sac.  Dkt. #26, pp.10-11.  Dr. Cardamone found that the plaintiff

continued to have range of motion limitations ranging from 20% to 42% in the cervical spine and 28% to 43% in the lumbar spine over a year after the accident.  Dkt. #24, ¶67.  In his affidavit, Dr. Cardamone concluded that the spinal range of motion limitations were consequential and permanent.  Dkt. #26, p.11.

Dr. Cardamone's records create an issue of fact as to whether the plaintiff's alleged spinal injuries posed a significant limitation.  "The Court is also mindful that disc bulges and herniations alone do not constitute a serious injury within the meaning of the No Fault statute, however, Plaintiff has submitted additional evidence relating to the extent or degree of her limitations."  *Sweeney*, 2018 WL 1428253, at *1 (internal citation omitted); *see also Williams v. Elzy*, No. 00 Civ. 5382, 2003 WL 22208349, at *9 (S.D.N.Y. Sept. 23, 2003) (collecting cases and noting that there was an issue of fact where the plaintiff suffered a loss of 50% range of motion in the cervical region and 40% loss of range of motion in the lumbar region for at least five months).

The defendant argues that both Dr. Cardamon's affidavit and Dr. Tetro's affirmation should not be considered because they were not based on a recent examination.  Dkt. #28, pp.6-7.  There is significant caselaw that discusses the need of recent examinations.  *See id.* (collecting cases).  However, most of that precedent does not "specifically address the degree of proof necessary for a 'significant limitation' claim as opposed to a 'permanent consequential limitation' claim, instead conflating these two categories of serious injury."  *Vasquez v. Almanzar*, 107 A.D.3d 538, 540 (N.Y. App. Div. 2013).

Logically, a recent examination may be necessary to assess the alleged injury's duration or confirm its permanency. However, because the significant limitation category does not require permanence, a recent examination may not be required if there is a sufficient record of the injury's degree and duration following the accident. *See Vasquez*, 107 A.D.3d at 540 ("[T]he lack of a recent examination, while sometimes relevant, is not dispositive by itself in determining whether a plaintiff has raised a triable issue of fact in opposing a defendant's prima facie evidence under the 'significant limitation' category."). Because Dr. Cardamone and Dr. Tetro treated the plaintiff for over a year and continued to find significant limitations a year after the accident, this Court finds that the plaintiff has sufficiently created an issue of fact as to his injuries' duration and therefore, whether he suffered a significant limitation. *See Buccilli*, 2016 WL 4940260, at *7 ("A 'significant limitation' of a body function or system must be 'significant,' meaning more than minor, in both degree and duration.")

However, case law establishes that a recent examination is necessary to establish a permanent injury, and therefore, the plaintiff has not established an issue of fact as to the permanent consequential category. *See Williams*, 2003 WL 22208349, at *6 ("New York Courts have held that physicians' affidavits based solely on examinations that are remote in time are insufficient to defeat a motion for summary judgment where the plaintiff claims a permanent injury."); *Bidetto v. Williams*, 276 A.D.2d 516, 517 (N.Y. App. Div. 2000) (concluding that where plaintiff claims a permanent injury and the treating physician last saw plaintiff more than two years before trial, her "projections of permanent limitations have no probative value in the absence of a recent examination" (internal quotation marks and citation omitted)); *Estrella v. Geico Ins. Co.*, 102 A.D.3d

30

730, 731-32 (N.Y. App. Div. 2013) (concluding that findings not based on a recent examination did not raise a triable issue of fact as to whether the injuries constituted a permanent consequential limitation of use but were sufficient to raise an issue of fact as to significant limitation of use).  Here, the only reference to permanence is in Dr. Cardamone's affidavit, which is not based on a recent examination.  *See* Dkt. #25-1. Furthermore, Dr. Cardamone's finding is conclusory after noting several times that the plaintiff's injuries were improving.  *See* Dkt. 25-1, ¶¶ 8, 9.  *See Mercado v. Lee*, No. 04 CIV. 7166 (PGG), 2008 WL 4963985, at *4 (S.D.N.Y. Nov. 21, 2008) ("Dr. Ushyarov's affirmation is also insufficient to defeat summary judgment because it merely states in a conclusory fashion that Mercado's injuries resulted in 'significant, consequential, permanent limitations,' without explaining the basis for this opinion.  A plaintiff cannot meet his burden by providing a conclusory physician affirmation."); *Adolphe v. Ramirez,* 173 A.D.2d 583, 583 (N.Y. App. Div. 1991) ("The mere repetition of the word 'permanent' in the affidavits of a plaintiff or a treating physician does not suffice to establish serious injury within the meaning of Insurance Law § 5102(d).  Summary judgment should be granted to the defendant where a plaintiff's evidence is limited to conclusory assertions tailored to meet statutory requirements.").  Therefore, the Court does not find that the plaintiff has established an issue of fact as to his alleged injuries' permanence.

In sum, the Court recommends that the defendant's motion be denied insofar as the plaintiff has established an issue of fact as to whether his shoulder and spinal injuries were significant limitations.  Dr. Cardamone's and Dr. Tetro's range of motion limitations were complimented by objective MRI testing, and though their respective

affidavit and affirmations were not based on a recent examination, the underlying reports suggest sufficient duration of the limitations.  In contrast, the Court recommends the defendant's motion be granted insofar as the plaintiff has failed to establish an issue of fact as to whether these injuries were permanent.  That is, only Dr. Cardamone referred to the plaintiff's injuries as permanent, but did so in an affidavit not based on a recent examination and in a conclusory manner.

**90/180 Category of Serious Injury**

The defendant also moved for summary judgment insofar as the plaintiff alleges that he sustained a serious injury in the form of a non-permanent injury that prevented him "from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." N.Y. Ins. Law § 5102(d).  Similar to the other categories of serious injury, a claim under this category must be supported by objective medical evidence of an injury.  *Sul-Lowe v. Hunter*, 148 A.D.3d 1326, 1327 (N.Y. App. Div. 2017).

In support of its position, the defendant notes that prior to the accident, the plaintiff did not work, but he spent his days taking care of his girlfriend's three-year-old child by watching her, feeding her, and watching TV with her.  Dkt. #18, p.15.  On the weekends, he spent time with his two children.  *Id.*  The plaintiff admits that he was able to continue caring for his girlfriend's child and spend time with his children, though he could not pick up the three-year-old child.  Dkt. #19, ¶97; Dkt. #24, ¶97.  The defendant also notes that as of February 2017, six months after the accident, the plaintiff could

perform all activities if he took breaks, except for playing basketball which he previously played once a month.  Dkt. #18, pp.15-16.

The Court concludes these facts satisfy the defendant's *prima facie* burden.  The plaintiff argues that "[w]hen a defendant fails to offer a contemporaneous medical opinion that adequately addresses plaintiff's claimed inability to perform his usual activities under the 90/180 days category, defendant's motion must be denied without regard to plaintiff's proof."[7]  Dkt. #26, p.6.  However, caselaw suggests that a defendant does not need any medical opinion to sustain its *prima facie* burden.  *See Beltran v. Powow Limo, Inc.*, 98 A.D.3d 1070, 1071 (N.Y. App. Div. 2012) (finding that defendant met its burden under this category by submitting plaintiff's deposition testimony that revealed that he did not miss any days from work in the first 180 days following the subject accident).

In seeking to establish a material issue of fact, the plaintiff notes that Dr. Cardamone's initial records from August 2016 show that a number of normal daily activities were negatively impacted by his injuries.  Dkt. #25-2, p.5 (marking as affected items such as sexual relations, bending, lifting, sleeping, standing, cooking, but not marking items such as bathing, shampooing hair, eating, watching TV, brushing teeth, dressing, childcare, driving, sitting, shaving, housecleaning, washing dishes).  The

---

[7] The plaintiff also argues that the Court should not consider Dr. Leddy's report, but that if it does, the Court should consider that Dr. Leddy did not examine the plaintiff until more than six months after the accident and did not address Dr. Cardamone's findings. Dkt. 26, pp.6-8 ("Dr. Leddy's report must be rejected altogether because of its numerous deficiencies and omissions. . . .Dr. Leddy's report fails to address these notations . . . which again disqualifies his opinion.").  However, the defendant did not cite to Dr. Leddy's report in support of this portion of its motion for summary judgment. *See* Dkt. #18, pp.14-16.

plaintiff notes that the records from September 2016, December 2016, and January 2017 continue to indicate impairments in performing ordinary activities such as taking out the trash, washing dishes, cleaning, and laundry. Dkt. #26, p.7 (citing records that are far from a model of clarity). Additionally, the plaintiff refers to his deposition testimony that he: 1) could not pick up his girlfriend's three year old child, 2) was only able to use one hand to lift groceries, 3) had trouble sweeping and mopping, 4) became tired from walking upstairs, 5) had difficulty reaching to cabinets, 6) was unable to walk more than a block, 7) could not sit more than five minutes without numbness, 8) would lean on things due to weakness, and 9) could not play basketball or with his children uninterrupted. Dkt. #26, p.8.

Further, the plaintiff notes that Dr. Cardamone states in his affirmation that the injury the plaintiff sustained to his left shoulder caused a temporary total disability extending for a year after the accident "during which time Mr. Howard was severely impacted in his ability to perform his normal and customary activities of daily living." Dkt. 25-1, ¶10. The plaintiff also points to Dr. Cardamone's records that include notations of total disability during the relevant 180-day time period. Dkt. #26, p.7. Likewise, Dr. Tetro asserted in his affirmation that the shoulder injuries "caused significant functional limitations in the use of the left shoulder and arm" that were longstanding. Dkt. #26, p.8.

Having considered all the evidence identified by the plaintiff, the Court nevertheless finds that the plaintiff has not created a material issue of fact. There must be evidence that the plaintiff has been "prevented from performing his usual activities to

a great extent, rather than some slight curtailment." *Escoto v. United States*, 848 F. Supp. 2d 315, 330 (E.D.N.Y. 2012) (alternations, internal quotation marks, and citation omitted). The plaintiff has failed to establish a clear record that either shows: 1) that any affected activities were a substantial, usual, or customary part of his life prior to the accident; or 2) that he was *prevented* from participating in those activities for *90 of the 180 days* following the accident. *See Brusso v. Imbeault*, 699 F. Supp. 2d 567, 583 (W.D.N.Y. 2010) (collecting cases and noting that no evidence established the frequency in which plaintiff engaged in activities prior to the accident); *Evans v. United States*, 978 F. Supp. 2d 148, 170 (E.D.N.Y. 2013) (noting that plaintiff failed to point to "evidence that taking out garbage, mowing the lawn, and picking his son up from school constitute[d] 'substantially all' of his daily activities" and finding that being prevented from picking up son from school on daily basis was only a slight curtailment); *see also Williams v. Perez*, 92 A.D.3d 528, 529 (N.Y. App. Div. 2012) (noting that evidence that plaintiff missed less than 90 days of work in the 180 days immediately following the accident and that he otherwise worked "light duty" is fatal to his 90/180-day claim). Therefore, this Court recommends granting summary judgment as to the plaintiff's claim that he sustained an injury that "prevented him from performing substantially all of the material acts which constitute [his] usually and customary daily activities" for 90 of the first 180 days after the accident.

## **CONCLUSION**

For the foregoing reasons, it is recommended that the defendant's motion for summary judgment be granted as to the plaintiff's claim for economic damages and non-economic damages based on significant disfigurement, permanent consequential

limitations, and an inability to perform substantially all of his daily activities for 90 of the first 180 days after the accident.  The Court recommends denying the defendant's motion as to non-economic damages based on the plaintiff's alleged significant limitation of use of his back and shoulder.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. ' 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

**DATED:       Buffalo, New York**
**June 14, 2022**

**s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**